Sherman **HALL** et al., Appellants,

v.

**E. H. FULLER**, Appellee.

Court of Appeals of Kentucky.

April 28, 1961.

Rehearing Denied Jan. 26, 1962.

Alvin B. Trigg, Lexington, Dwight L. Pendleton, Stanton, for appellants.

Troy D. Savage, Lexington, for appellee.

PALMORE, Judge.

In settlement of a dispute between them concerning an oil and gas leasehold Miller and Hall, the lessees, entered into a contract with Fuller, the lessor, whereby they undertook to guarantee him a certain royalty interest. This suit was brought by Fuller against Miller's devisees and Hall to enforce the contract. The controversy was reduced to two issues, involving construction of the agreement and the question of whether there was adequate consideration to support it. Both were decided by the trial court in Fuller's favor.

By two instruments executed in 1948 Fuller leased the oil and gas in a 400-acre tract in Powell County to Hall (who then assigned a partial interest to Miller). In 1949 the J. S. Abbott heirs executed in favor of one Fitch an oil and gas lease covering 140 acres of land which the Abbott heirs claimed lay within the boundary of the 400 acres leased by Fuller to Miller and Hall. In September of 1950 Miller and Hall took an assignment from Fitch and thereupon held under each of the antagonistic leases. They commenced a well on the disputed 140-acre portion of the 400 acres in the latter part of 1950. Fuller, learning of the assignment his lessees had taken from Fitch, regarded this act as a recognition of the adverse claim of the Abbott heirs and a reflection on his title. He threatened to sue, making Miller and Hall parties to the litigation. Hall's first

reaction was to say that he did not want to get into any litigation and stop the oil runs, and later he and Miller entered into a series of negotiations with Fuller in order to settle the dispute.

At this point, in order that the negotiations and the subject matter of the contract may be clearly understood, it is necessary to recite that the title claimed by the Abbott heirs stemmed from a deed made by one V. H. Fuller in 1917, in which the grantor retained an undivided $\frac{1}{16}$ interest in the oil rights. V. H. Fuller being also the predecessor in title of E. H. Fuller, it was taken for granted by all concerned throughout the proceedings under discussion that even if the Abbott heirs should prevail in their claim (as they eventually did) E. H. Fuller still would be entitled to $\frac{1}{16}$ of the oil produced from the disputed 140 acres.

On July 3, 1951, the parties met in the law office of the late Malcolm Strange at Stanton, Kentucky. Miller and Hall had caused to be prepared, under date of July 2, 1951, a contract conformable to their understanding of the agreement reached in the preceding negotiations. After fully reciting the circumstances it provided as follows:

> "1. The first parties agree to pay the said second party a one-sixteenth ($\frac{1}{16}$) of eight-eighths ($\frac{8}{8}$) of the oil produced from said Fuller Well No. 7 and any and all wells which may be drilled on said disputed property. This one-sixteenth ($\frac{1}{16}$) royalty is in addition to the one-sixteenth ($\frac{1}{16}$) royalty which said second party is entitled to receive under and by virtue of the aforesaid deed from V. H. Fuller to Abbott. Thus, the said second party will receive a full one-eighth ($\frac{1}{8}$) of eight-eighths ($\frac{8}{8}$) of all the oil produced from said lease.

> \*　　\*　　\*　　\*　　\*　　\*

> "3. In the event the controversy between the said Abbotts and the said sec-

ond party is adjudicated, and the Abbotts prevail in their claim as to the location of said 140 acres, then, and in that event, second party shall not be entitled to said one-sixteenth ($\frac{1}{16}$) of the oil on the lease located on said 140 acres as provided in this agreement."

Upon examining the draft Fuller made certain changes by pencil on its face. He says he did it on the spot and in the presence of the other parties. The other witnesses say he did not make the changes at that time. In any event, the agreement was not signed, and Fuller took the draft home to Lexington for further examination. Between July 4 and July 6 he had it re-typed to conform to the changes he had marked on it, and on the latter date mailed it to Miller. It was then signed by Miller and Hall and an executed copy returned to Fuller on July 18, 1951.

The significant departure from the original draft is in clause 3, which in the signed contract reads as follows:　　.

> "3. In the event the controversy between the said Abbotts and the said second party is adjudicated, and the *second party* prevails in *his* claim as to the location of said 140 acres *and is adjudged the full $\frac{1}{8}$ Royalty* then, and in that event, second party shall not be entitled to said one-sixteenth ($\frac{1}{16}$) of the oil on the lease located on said 140 acres as provided in this agreement." (Italics ours, indicating changes from original draft.)

Thus it may be seen that whereas the draft provided, in effect, for termination of the agreement if the Abbotts should win, the final version provided for termination if Fuller should win. According to Fuller, that was his understanding all along, so that he would wind up with his full $\frac{1}{8}$ either way. Hall and the attorneys who participated in the various stages of the transaction testified, on the contrary, that the draft represented the real agreement. Nevertheless, there is no question of fraud or mis-

take in this case. Miller and Hall had able counsel at their disposal, knew that changes had been made (though Fuller referred to them as "minor" in his transmittal letter of July 6, 1951), and had ample opportunity to inspect the contract before signing it. The Miller-Hall position is that the contract is ambiguous, admitting of parol evidence to explain it, and that it should be construed to mean what it said before it was revised by Fuller. It was on the theory of ambiguity that the trial commissioner received evidence of the events leading up to the final execution of the agreement.

■ The contract as originally drawn and tendered to Fuller was a reasonable one. That Miller and Hall may not have wished to make the agreement represented by the document they eventually signed is understandable. But the cold fact is that they did sign it, and we do not think it is ambiguous. The trial commissioner found it so on the theory that it was silent on the question of whether Miller and Hall were to continue paying the ⅟₁₆ if Fuller should lose his suit with the Abbott heirs. A fractional share in the production of minerals, whether it be so called or not, is a royalty (cf. 37A Words and Phrases pp. 600–608), and it is common knowledge that a royalty interest under a particular lease ordinarily endures for the life of the lease unless the instrument creating it indicates a contrary intention. (Fuller changed the word "royalty" at the first place it appears in paragraph 1 of the draft to read "interest" in the final contract, but that did nothing to change its essential nature.) The preamble of the contract contains no language to indicate an intention to limit its effect to the period of time during which the controversy between Fuller and the Abbott heirs existed. So paragraph 1 is crystal clear and unambiguous insofar as it requires Miller and Hall to pay Fuller a royalty of ⅟₁₆ of the oil produced from the 140-acre portion of the lease in question, exclusive of the royalty interest to which he claimed to be entitled through the reservation in the 1917 V. H. Fuller-Abbott deed.

Paragraph 3 does contain a limitation, and the only limitation, on the duration of the royalty interest created by paragraph 1. Again, that limitation is perfectly clear. The interest ends if and when Fuller should prevail, in the form of an adjudication, in his dispute with the Abbott heirs. Since that contingency never occurred, and is forever closed by the fact that the adjudication was in favor of the Abbott heirs, the explicit terms of paragraph 1 remain in full force and effect.

It is conceded that the consideration moving from Fuller was his forbearance to sue. He thought the taking of an assignment from Fitch constituted a transfer of fealty by Miller and Hall, giving rise to a cause of action on his, the landlord's part. Assuming that he was mistaken in this belief, it is conceded also that his claim was in good faith.

There seem to be three views on the sufficiency of forbearance to sue as a valid consideration in support of a contract. The first is that the claim must be legally enforceable. The second is that it must be doubtful at least. The third is that it need only be in good faith. See 17 C.J.S. Contracts § 104b, p. 461. The second view, that "the suit forborne must not be wholly and certainly groundless or unsustainable at law or in equity," and that "good faith or an honest belief in its soundness alone is not enough," is supported in Forsythe v. Rexroat, 1929, 234 Ky. 173, 27 S.W.2d 695, 697; Hardin's Adm'rs v. Hardin, 1923, 201 Ky. 310, 256 S.W. 417, 38 A.L.R. 756; and Baker v. Vanderpool, 1944, 296 Ky. 663, 178 S.W.2d 189. This also was the rule stated in Sellars v. Jones, 1915, 164 Ky. 458, 175 S.W. 1002, but in Cook v. Cook, Ky.1957, 299 S.W.2d 261, 264, the latest case on the subject in this jurisdiction, this court, while apparently recognizing that a claim may be so clearly groundless that it cannot be in good faith, said: "It is only essential that the claim be asserted in good faith." This comes so close to the third view enumerated above as to be practically indistinguishable from it. The rule is

stated in 12 Am.Jur. 577 (Contracts, § 82) as follows:

"The relinquishment of an invalid claim is ordinarily insufficient for a promise. Where, however, the claimant has an *honest and reasonable* belief in the validity of an invalid claim, the relinquishment of such claim is sufficient consideration to support a promise." (Emphasis added.)

We believe the sound viewpoint to be that good faith is enough unless the claim is so obviously unfounded that the assertion of good faith would affront the intelligence of the ordinary and reasonable layman. In this case it was treated seriously not only by the laymen involved, but several lawyers as well. It was certainly regarded as of more than nuisance value. Asserted in good faith, we conclude that it was sufficient to give substance to the promise of forbearance.

The judgment is affirmed.